## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**IRIS COVINGTON**                        **CIVIL ACTION NO. 06-812-RET-SCR**

**VERSUS**

**SID GAUTREAUX, ET AL.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

### FACTS:

Plaintiff, Iris Covington, was a long-time employee of the defendant until her constructive discharge on January 6, 2005, having served two (2) long-term employment periods with the defendant.[1] During her last term of employment with defendant, Ms. Covington was an officer in Communications. Ms. Covington, unlike most of her colleagues in Communications was actually POST-certified, having attended the Law Enforcement Academy and continually maintaining her POST certification, including with her weapon, on an annual basis.[2] By all accounts, Ms. Covington was an exceptional employee. Her work performance was, at all times, "fine, great", "one of the most knowledgeable employees in Communications"[3], "good employee", "never had ANY problems working with her"[4], she had "fine" work performance[5], she did a "good job", "had no issues with her" - perception shared among her supervisors, she performed well at all positions in Communications, "showed" new hires/trainees what to do"[6], she was a "good employee", "knew her job", had "more experience" than almost anyone in Communications, was

---

[1]Covington deposition, A, pp. 13, 20, 32-42, 74, 80-81, 136

[2]Covington deposition, A, pp. 41-43, 51-53

[3]Ballard deposition, H p. 21

[4]Frederic deposition, I, p. 11

[5]McGehee deposition, D, p. 10

[6]Opperman deposition, K, pp. 10-11, 24-25

1

Case 3:06-cv-00812-RET-SCR   Document 26   05/02/08   Page 1 of 33

"more knowledgeable" in Communications than almost anyone else in Communications.[7]

Ms. Covington suffers from severe scoliosis with a 43° (bent to nearly ½ of a 90° angle) bend in her spine which causes her to walk in an obviously "crooked" fashion, in addition, she has disk herniations in her neck (secondary to the scoliosis), along with degenerative disk disease in her remaining spinal column (secondary to the scoliosis).[8] In addition, Ms. Covington became further disabled with severe migraines caused by extreme stress in her workplace at the Sheriff's Office as well as secondary to her scoliosis and disk herniations.[9] During her employment with the defendant, she was treated by orthopaedist, Dr. Isaza, and her general practitioner, Dr. Wissner.[10] Ms. Covington was first diagnosed with severe scoliosis at age 15-16 years. There is no currently available surgical treatment for Ms. Covington and her disability remains incurable, deteriorating, and life-long.[11]

For his part, Dr. Isaza testified that Ms. Covington suffers from adolescent idiopathic scoliosis, meaning its onset began in her adolescence. Ms. Covington's scoliosis is extreme and occurs in BOTH the lumbar and thoracic regions of her spinal column.[12] In addition to the severe scoliosis, Ms. Covington developed, secondary to the scoliosis, degenerative disk disease at L3/4, L4/5, L5/S1 and, additionally, a disk herniation at C5/6.[13] Dr. Isaza restricted Ms. Covington's activities, including to light duty and no lifting over 20 pounds, no repetitive bending or stooping, a limitation of working hours, and the ability to frequently change positions. Ms. Covington experiences "severe" pain when she is standing and sitting

---

[7]Maurello deposition, E, pp. 19-20, 33

[8]Covington deposition, A, pp. 20, 23-32; Wissner deposition, C, supra

[9]Covington deposition, A, pp. 98-99, 146; Wissner deposition, C, pp. 11, 12-13, 16, 21, 22, 26, 30-32, 47-48

[10]Covington deposition, A, pp. 20-22; Isaza deposition, B, portions supra; Wissner deposition, C, portions infra

[11]Covington deposition, A, pp. 98-99, 146, 226-234, 332-333

[12]Isaza deposition, B, pp. 10-11

[13]Isaza deposition, B, pp. 14-16, 46-48

2

for long periods of time as well as an inability to even stand at all at times.[14] Ms. Covington's condition

is not only chronic, but also incurable.[15] Ms. Covington, according to Dr. Isaza has marked inability to

walk (a positive Patrick test).[16] Dr. Isaza confirmed that Ms. Covington suffers permanent and substantial

impairments in her major life activities of walking, stooping, sitting, working, and standing.[17] Dr. Wissner

attested that Ms. Covington's disability also impairs the major life activity of sleeping. Dr. Isaza also

testified that Ms. Covington's scoliosis is "severe", "progressive", life-long.[18] The $43°$ curvature of Ms.

Covington's spine is plainly visible on X-rays which, at the request of the defendant, Ms. Covington

brought to her supervisors to show them.[19] Dr. Isaza and Dr. Wissner both identified, to the defendant,

a much-needed accommodation for Ms. Covington consisting of limiting her working hours to 8 per day

on a consistent schedule.[20] Ms. Covington's first request for accommodation was on July 24, 2000,

wherein she requested accommodation due to her disability to a straight day, 8 hour position and even was

willing to accept a reduction in pay in exchange for the accommodation.

     Ms. Covington, in addition to having an actual impairment which limits her major life activities

of standing, walking, bending, climbing, stooping, sleeping, and working, had a record of this impairment.

As stated, as far back as July 24, 2000, Ms. Covington requested accommodation from this defendant. At

first, under then-Communications Lieutenant Julie Angelloz, the defendant accommodated Ms. Covington,

on and off, throughout her tenure in Communications. Lt. Angelloz "worked with" Ms. Covington

---

[14]Isaza deposition, B, pp. 18-19, 31-38; Covington deposition, A, pp. 146-147, 147-148

[15]Isaza deposition, B, pp. 21-25

[16]Isaza deposition, B, pp. 48-52

[17]Isaza deposition, B, pp. 59-62, 63-64, 65-66

[18]Isaza deposition, B, pp. 62-65

[19]Isaza deposition, B, pp. 66-70; Covington deposition, A, pp. 294-296, 330-331

[20]Isaza deposition, B, infra; Wissner deposition, C, portions infra; Covington deposition, A, pp. 149, 335 (Ms. Covington reiterated this requested accommodation no less than 20 times to the defendant); 121, 123-124, 139, 150-176, 187-188, 192

Case 3:06-cv-00812-RET-SCR   Document 26   05/02/08   Page 3 of 33

regarding her disability.[21] However, Lt. Angelloz retired in late, 2003, and specifically told Ms. Covington that part of the reason she decided to retire was because she had accommodated Ms. Covington during her employment with the defendant which apparently upset Administration.[22] Indeed, in order to obtain the requested and needed accommodations consisting of adjusting Ms. Covington's working hours to straight days, 8 hour shifts, Ms. Covington had taken reductions in her pay.

However, following Lt. Angelloz's departure from employment with the defendant, any accommodations to Ms. Covington were abruptly stopped. In addition to the repeated denials of accommodation, Ms. Covington was singled out for harassment on account of her disability. She was clearly "regarded as" being disabled by her superiors. After Lt. Angelloz's departure, Ms. Covington was supervised by Lt. Dana Bass, Lt. Kirk Dupre, Lt. Sherry Raiford, Lt. Pat Opperman, Lt. David Luker, Sgt. Nicky Lane, Lt. Cathy Daniels, Deputy Devan Jarreau, Capt. Frederic, Major Fourier, Major Raybon, Lt. Rhonda McGehee. Captain Frederic testified that he knew Ms. Covington had "serious scoliosis" which was "debilitating" and a "lifelong" disability, and that Communications officers were "making fun of the way she walked." Frederic also testified that he knew Ms. Covington was suffering from a very painful condition.[23] Major Raybon testified that he knew of Ms. Covington's disability as far back as 2000 when they worked together at Kleinpeter substation, that he and Frederic had discussed Ms. Covington's scoliosis and accommodations, that he had discussed Ms. Covington's "medical problems" with HR, he knew she was having medical problems with the scoliosis (was told by Frederic).[24] Lt. Bass testified that she not only saw Ms. Covington's back X-Rays, but that they were "painful to look at", she knew Ms. Covington had a lot of pain and trouble sleeping, that Ms. Covington's spine looked "weird", she was

---

[21]Covington deposition, A, pp. 140-142, 76-78, 91-102

[22]Covington deposition, A, pp. 141-144

[23]Frederic deposition, I, pp. 11-14, 103-105, 32

[24]Raybon deposition, F, pp. 16-18, 50, 18-19, 20-21, 22, 24-25, 54-56

4

"crooked", she knew Ms. Covington's back was "bad".[25] Lt. Rhonda McGehee testified that not only did she know Angelloz had previously accommodated Ms. Covington, but that also knew Ms. Covington had severe scoliosis which caused her a lot of pain and she had severe headaches as well.[26] Lt. Opperman testified that Ms. Covington's back "looked painful", that she walked with a different gait and "she looked like she was in pain at times", that Ms. Covington walked in a "stooped" manner.[27] Gloria Ballard testified that Ms. Covington's disability was so obvious, she could see her pain, and saw an "obvious curve" in her spine.[28] Stephanie Maurello also testified that all were aware of Ms. Covington's severe scoliosis.[29]

On a daily basis, out in the open and in front of all of the Communications staff (which worked in a large open room), Ms. Covington was subjected to derogatory comments on account of her disability:

By Lt. Bass directed at Ms. Covington on a daily basis:

-Ms. Covington "looked funny" because her uniform made the curvature of her spine "more distinct" and one of her hips is higher than the other;
-Ms. Covington's gait and stance "looked funny";
-"a lot of comments about looking funny, being crooked";
-"get out of bed and come to work" when Ms. Covington, because of her disability had to miss work;
-that Ms. Covington was a "liar", that there was really nothing wrong with her, that she was "crazy" and needed medication, that she "trumped everything up";
-Ms. Covington needed to "fix it" referring to her disability or she would be sent to the prison.[30]

By Lt. Kirk Dupre directed at Ms. Covington (who replaced Lt. Bass at the end of 2004):

-he was "going to stop that stuff" [referring to Ms. Covington], that Ms. Covington was "dragging out a backache and he was sick of it and he would fix it";
-that Ms. Covington was "milking some sort of backache";
-that Ms. Covington was a "liar" about her disability.[31]

---

[25]Bass deposition, G, pp. 17, 51, 22, 23

[26]McGehee deposition, D, pp. 11-12, 25

[27]Opperman deposition, K, pp. 15-17

[28]Ballard deposition, H, pp. 23-24, 26

[29]Maurello deposition, E, pp. 21-22

[30]Covington deposition, A, pp. 112-114, 328, 332, 346, 106-107, 108

[31]Covington deposition, A, pp. 131-132, 330-332, 344

5

By Lt. Sherry Raiford directed to Ms. Covington:

-Ms. Covington "looked funny because [her] pants were longer on one side and [she] needed to fix it";
-Ms. Covington "needed medication" or "Prozac".[32]

By Lt. Pat Opperman directed to Ms. Covington:

-Ms. Covington "needed to get [herself] together and fix" [her medical issues] in order to move forward, get rank, go to training classes;
-Ms. Covington "was a pussy" when she missed work on account of her disability and "needed to get over it";
-Opperman made these comments "all the time";
-that Ms. Covington was a "liar" about her disability.[33]

By Deputy Jarreau directed to Ms. Covington in front of her shift and her supervisors:

-"do you have your heating pad tonight?";
-"I know your back hurts";
-"you better make sure she [Ms. Covington] has her heating pad", "we don't want her bitching".[34]

By Lt. Luker directed to Ms. Covington:

-the only way you will get rank or anymore training is if you "fix your [medical] problem";
-you need to "fix your medical problems";
-that Ms. Covington had been taken out of the running for a class "when all this became heated" [referring to Ms. Covington's accommodations requests in 2004].[35]

By Captain Frederic directed to Ms. Covington:

-"buck up" [regarding her disability], you are not going to be transferred to any daytime positions;
-"buck up", "get tough", "just do it" [regarding her disability];
-"be careful" because there is talk going around Administration about plaintiff's disability.[36]

Not only was Ms. Covington offended by these derogatory comments levied at her by her supervisors, but she also repeatedly made her objection to same known, all to no avail.[37]   Defendant undertook no

---

[32]Covington deposition, A, p. 131

[33]Covington deposition, A, pp. 117, 331,332, 120-121, 128-130

[34]Covington deposition, A, p. 133

[35]Covington deposition, A, pp. 103-104, 121, 123-124-126

[36]Covington deposition, A, pp. 134, 343

[37]Covington deposition, A, pp. 332-333

Case 3:06-cv-00812-RET-SCR   Document 26   05/02/08   Page 6 of 33

investigation into Ms. Covington's complaints and no corrective actions.[38]  In a futile effort to obtain accommodations and to stop the continual accusations that Ms. Covington was "milking a backache" and was a "liar", Ms. Covington even brought in her actual MRI's and X-Rays and showed them to Captain Frederic, Lt. Bass, Lt. Pat Opperman.[39]  In spite of her repeated protests, the disability-based harassment continued "daily" in front of the supervisors, who were often the preceptors of the discriminatory remarks.[40]

Ms. Covington continued to request accommodation consisting of a straight day, 8-hour shift, but was continually denied same beginning in 2004 (after Angelloz was gone).  Ms. Covington even repeatedly advised the defendant she would take any straight day, 8-hour position, "**even it meant a reduction in pay**, to get a consistent schedule" and she was repeatedly "refused."[41]

It was, however, undisputed that the defendant routinely allowed deputies who had been injured or were recovering from surgery to work in Communications on straight day, 8-hour shifts (light duty), and even allowed employees, like Gloria Ballard, to miss 20 days of work (same as Ms. Covington's alleged 23 days in over a calendar year) for foot surgery, without ever being written up.[42]

Throughout 2004, Ms. Covington continued to request the accommodations, to no avail.  In July, 2004, she again applied to Lt. David Luker for a telecommunicator position - there were four (4) such positions (at least two of which were vacant the entirety of 2004, but Ms. Covington was denied same) in

---

[38]Bass deposition, G, pp. 46, 59

[39]Covington deposition, A, pp. 294-296; Bass deposition, G, pp. 17, 22-23, 51; Opperman deposition, K, pp. 15-16

[40]Covington deposition, A, p. 328

[41]Covington deposition, A, pp. 86-91, 149; Frederic deposition, I, pp. 18-19, 20, 21, 22-23, 25, 27; Raybon deposition, F, pp. 22, 24-25, 18-19; Bass deposition, G, pp. 21-22, 41

[42]Ballard deposition, H, pp. 39-40; McGehee deposition, D, pp. 16, 30-32; Bass deposition, G, pp. 35-36; Frederic deposition, I, pp. 30-31

7

Communications.[43] From July, 2004 through Ms. Covington's constructive discharge on January 5, 2005, there were these four (2) straight day, 8-hour telecommunicator positions available in Communications. Indeed, at the time of her constructive discharge and throughout 2004, two (2) of these positions remained opened and not filled. These positions were identical to Ms. Covington's position except they were straight day, 8-hours instead of 12-hour rotating shifts. Ms. Covington testified that the defendant had posted many letters on the bulletin board seeking people for the four (2) telecommunicator slots and she constantly requested this position for which she was imminently qualified (in fact, it was a step down from the position she was holding), to no avail.[44] Each time she requested the accommodation, **she made it plain she would even take a cut in pay**, including directly asking then-Communications Commander, Major Raybon, on two (2) occasions, who refused. She also made these requests to all of her supervisors, including Captain Frederic who flatly told her he "would not transfer" her and, even when she offered to take a cut in pay if "that's what's needed", he still refused her accommodation.[45] Captain Frederic's only response was for Ms. Covington to "buck up" and "get tough" regarding her disability.

For his part, Major Fourier (over Communications) denied Ms. Covington straight days "immediately" upon her request.[46] In response, Major Fourier, without any basis, ordered Ms. Covington to obtain a "fitness for duty" examination, even though Ms. Covington had been performing her job: "she needs to leave and go home until she can bring back a fitness for duty form filled out by her doctor". She

---

[43]Covington deposition, A, pp. 86-91; Opperman deposition, K, pp. 7-8, 8-9, 10-11; Bass deposition, G, pp. 26-29, 31-33 (telecommunicator day positions are the same job as deputy Communications officer and Ms. Covington was imminently qualified for the day positions); McGehee deposition, D, pp. 14-17, 34, 35, 38-40, 30-32, 63-65, 65-66, 66 (Communications was even "short handed" with telecommunicators and had openings in 2004); 68, 69-71 (telecommunicator vacancies available to plaintiff in 2004); Frederic deposition, I, pp. 61; Ballard deposition, H, pp. 15-17, 18-20, 20-21; Maurello deposition, E, pp. 10-11, 12-13, 13-14, 14-15, 15, 16-17

[44]Covington deposition, A, pp. 193-214, 262-263

[45]Covington deposition, A, pp. 134-135

[46]Covington deposition, A, p. 145

Case 3:06-cv-00812-RET-SCR   Document 26   05/02/08   Page 8 of 33

was ordered to turn in her weapon, her gear, and stripped of her uniform and state supplemental pay, without basis.[47] Ms. Covington lost two (2) days of pay which has never been reinstated.[48] According to Captain Vernon Frederic, Raybon could order a fitness for duty (which Raybon apparently did through Karen Fourier - Major Fourier's wife), but there was basis for ordering same in the instance of Ms. Covington. She had not missed work prior to the fitness for duty order and she had just POST qualified with her weapon on May 5, 2004. He testified Ms. Covington could not refuse the order unless she wanted to be fired.[49] For his part, Major Raybon testified that the fitness for duty examinations were initiated by Frederic and he was told by Frederic the reason was because Ms. Covington had been missing time from work because of her back problems/scoliosis.[50] It is clear that the defendant's own witnesses conflict each other as to who gave the order for the fitness for duty, but both agree there was no basis for the fitness for duty requirement of Ms. Covington. Lt. Bass testified that a fitness for duty, according to the defendant's own policies, is only required if an employee has been out for surgery or, after an injury, is seeking to return to work.[51] She too, confirmed there was no reason Ms. Covington should have ever been required to undergo a fitness for duty examination - let alone, three (3) of them.

When Ms. Covington returned the same day with the completed form, she was ordered, because the Dr. Isaza form indicated restrictions, to "go get it cleared", meaning no restrictions, or she could not return to work and would lose her job immediately. Unsatisfied with that response from Dr. Isaza, Fourier ordered Ms. Covington to the defendant's doctor, Dr. Tujaque, who looked at Ms. Covington for 15 seconds and signed the form. Ms. Covington even resorted to an "informal" contact with Lt. McAllister in Internal Affairs regarding Major Raybon's stripping her of her gear and state supplemental pay who

---

[47]Covington deposition, A, pp. 150-176, 177-178, 178-179, 179-181, 182

[48]Covington deposition, A, p. 343, 276-277

[49]Frederic deposition, I, pp. 62-65, Exhibit 13 to Frederic deposition, 56, 67-72, 73

[50]Raybon deposition, F, pp. 54-56

[51]Bass deposition, G, p. 53

9

advised Ms. Covington to contact the State Board. When she did, she was advised his actions were unlawful.[52]

In addition to the four (4) total positions available as a telecommunicator (which was the same job Ms. Covington was performing except that it was a straight day, 8-hour position, instead of 12-hour rotating shifts - two weeks on nights and two weeks on days), not only were two (2) available and unfilled throughout 2004, Ms. Covington applied for and was denied four (4) newly created straight day, 8-hour positions in Communications: 1) radio room position (which Ms. Covington had also performed for several years) ultimately given to Stephanie Morello, non-disabled with far less seniority than Ms. Covington; 2) Captain's Administrative Assistant (which Ms. Covington was completely qualified for) given to Tammy White, non-disabled with far less seniority than Ms. Covington; 3) EVI - stolen cars/local data entry (which Ms. Covington had also performed for several years) given to Sandy MaRoy, non-disabled with far less seniority than Ms. Covington; 4) daytime trainer position (for which Ms. Covington was completely qualified as she had served as the trainer for all new hires into Communications for years) given to Gloria Ballard, non-disabled with far less seniority than Ms. Covington and which position also, as initially posted, required the applicant to be POST-certified which Ms. Covington was and Ms. Ballard WAS NOT.[53] In addition to all of these positions which were requested by Ms. Covington and denied to

---

[52]Covington deposition, A, pp. 313-317

[53]Covington deposition, A, pp. 81-85, 193-214, 333-334, 200, 203, 205-206; Opperman deposition, K, pp. 8-15 (Ms. Covington was qualified for all of these positions), 28-30 (the non-disabled comparitors were not even POST certified), 46 (could always use an extra body on a straight day position in Communications); Maurello deposition, E, pp. 5-6, 10-11, 12-13, 13-17, 33, 20, 30-31; Ballard deposition, H, pp. 7, 11, 9-10, 12 and 47-48 (she made the same amount of money as Ms. Covington with less seniority), 15-17 (her job as CTO - Communications Training Officer - was posted as **requiring** POST certification, but she was NOT POST certified (Ms. Covington was) at the time of her application, 16-17 (she has never taken defensive tactics), 18-20, 20-21; McGehee deposition, D, pp. 50-51 (Ms. Covington could do all of the duties of telecommunicator), 63-65 (Ms. Covington was up for the CTO position given to Ballard), 65-71 (Morello got the radio, straight day job and Communications is still short-handed with 2 open positions now and in 2004)

Case 3:06-cv-00812-RET-SCR   Document 26   05/02/08   Page 10 of 33

her in spite of her superior seniority and the fact she had been performing all of these job throughout her long tenure with defendant, the defendant also created a "liaison position" which was given to Jessica Broussard, non-disabled with, again, far less seniority than Ms. Covington. Contrary to Frederic, Raybon testified that Frederic had the authority to even create straight day positions in Communications, had he wanted to.[54] Frederic testified that not only were there straight day, 8-hour jobs available in Communications that Ms. Covington was qualified to perform, but that it was Raybon who even posted them and Raybon who made up a requirement for application for the applicant to present their "attendance record" for the past year.[55] Frederic also testified that it was Raybon who vetoed Ms. Covington's attempts to transfer.[56] Also, entirely contrary to his "Affidavit", Frederic testified that Ms. Covington applied for a telecommunicator position due to medical reasons in February, 2004.[57] Lt. Bass testified that she was personally aware of "several times" Ms. Covington (in 2004) tried to get on straight days and that she "doesn't know why" Ms. Covington was turned down.[58] Frederic also testified, as set forth herein, to the plethora of positions available to Ms. Covington which, according to Ms. Covington, she actively sought and was denied.

Following her repeated requests for accommodations, Ms. Covington was "written up" by Lt. Bass. The "write up" was, in substance, for absences Ms. Covington had during the period of 12/10/03 - 12/7/04. Never at any time prior had Ms. Covington been written up for any absences and it remains undisputed that Ms. Covington did not exhaust her time on the books as she even received moneys from the defendant

---

[54]Raybon deposition, F, pp. 74-75

[55]Frederic deposition, I, pp. 33-38, 38-41, 95-102, Exhibits 8, 9, 10, to Frederic deposition

[56]Frederic deposition, I, p. 32

[57]Frederic deposition, I, pp. 18-19, 25-26, 34-35

[58]Bass deposition, G, pp. 21-22

11

for unused, accrued time at her constructive discharge.[59]  Ms. Covington had missed only 23 days during the entire one year period of time and all for her disability and, on each occasion, she had brought in a doctor's excuse.  It is undisputed that Ms. Covington was entitled to FMLA (up to 12 weeks leave during a calendar year) for her disability and had actual leave time with the defendant on the books.  In addition, Ms. Covington, in early 2004, had received a "glowing" performance review which said nothing about absences and a letter of commendation.[60]  Lt. Bass had been ordered to write Ms. Covington up by Major Raybon.[61]  Lt. Bass, on each occasion she was presented with a doctor's note by Ms. Covington, would respond in a "disinterested fashion" and, in the same shift, "she would make fun of how I'm walking or how I'm sitting."[62]

Flatly contradicting this evidence, Major Raybon testified that he would NOT have written an employee, like Ms. Covington, up for missed time dating back for the year.  He also testified that an employee with a disability or injury was considered to have an "explainable" absence and that it was **against Sheriff's Office policy to write up an employee for an excusable absence** and, further excusable/explainable absences could NOT serve as the basis, under any circumstance, for an excessive absenteeism write up.[63]  Frederic, however, testified that it was Raybon who wanted Ms. Covington's attendance record, there were no standards regarding any requirement of bringing in doctor's notes with absences, and that he knew the reason Ms. Covington had missed work in 2004 was because of her "disability."[64]  He also testified that Ms. Covington's write up which she signed on December 16, 2004, but that had been presented to her days before, was without any prior warnings to the plaintiff, and only

---

[59]Covington deposition, A, pp. 215-216, 218, 220-222, 341-343, 335, 250, 252, 337-338

[60]Covington deposition, A, pp. 115-116

[61]Covington deposition, A, pp. 220-222

[62]Covington deposition, A, p. 346

[63]Raybon deposition, F, pp. 56-57, 60-61

[64]Frederic deposition, F, pp. 42-44, 44-45

12

the Sheriff (who was not functioning then) could have intervened.[65]  Even according to Lt. Bass, on review of the defendant's alleged documents regarding Ms. Covington's attendance, the records were obviously wrong, didn't "compare", and reflected that "somebody" took 18 hours of leave from Ms. Covington "for no reason."[66]  Noted also, contrary to defendant's argument in brief, Ms. Covington may have signed the write up on December 16, 2004, but she had been made fully aware of its impending existence well prior, including Bass' prior threat to transfer her to the prison - as punishment.[67]

Toward the end of her employment, Ms. Covington also requested accommodation in the form of a chair with lumbar support.  That request was also denied and, after months, Ms. Covington "found" a chair not being used during some of her shifts which she could use part of the time.  In response to the chair request, Major Fourier laughed and "thought it was funny".[68]

The unabated situation in her working environment, including the back-dated write up for the "entire year", left Ms. Covington with no reasonable alternative but to leave her employment which she did on January 5, 2005.  Ms. Covington attested that she "resigned because [she] had asked [the defendant] numerous times to work with her", to no avail, she had been repeatedly threatened with termination, the treatment at the hands of the defendant was "horrible", the working environment was "killing me", she had "tried everything" to no avail, she had been threatened, on two occasions, by Major Raybon with termination or transfer to the prison - a punishment - for her even asking for accommodations.[69]  Quite literally, Ms. Covington was "forced" to leave her job and was constructively discharged.[70]

At all pertinent times, the defendant had no effective policy regarding disability-based harassment

---

[65]Frederic deposition, F, pp. 51-65

[66]Bass deposition, G, pp. 66-73

[67]Covington deposition, A, pp. 107-114, 215-216, 245-255 (forged attendance records)

[68]Covington deposition, A, pp. 187-188, 190, 329-330

[69]Covington deposition, A, pp. 258-259, 235-236

[70]Covington deposition, A, pp. 305-306

13

or discrimination or non-retaliation. Ms. Covington testified the only mechanism available to her was the "chain of command" and she had repeatedly exhausted those avenues, to no avail. Toward the end of her employment, Ms. Covington even undertook a full review of the Sheriff's Office Policy and Procedure Manual and found nothing.[71] Ms. Covington even asked Major Raybon for permission to go formally to Internal Affairs and was denied. Raybon told Ms. Covington: "he could make or break the rules, he was Administration."[72] Captain Frederic, Ballard, the alleged Communications Training Officer who was not qualified to even apply for the job and got it over Ms. Covington, Morello [ed note: also spelled "Maurello" throughout the depositions], who got the telecommunicator and Radio straight day jobs over Ms. Covington, Lt. Dana Bass, and even Major Raybon all testified they were unaware of any Sheriff's Office policy regarding disability-based harassment, discrimination, or retaliation, and the only reporting mechanism was the "chain of command." Raybon even added there was no entity within the Sheriff's Office in 2004 tasked with the responsibility of handling discrimination issues.[73]

Finally, adding insult to injuries, Ms. Covington requested of Raybon a volunteer position in Reserves, which he of course denied because Ms. Covington "needed to fix" her medical problems.[74] When questioned, Raybon admitted he undertook no effort to initiate any dialogue with the plaintiff for her to be a reserve officer.[75]

Defendant seeks summary judgment contending only that 1) Ms. Covington does not suffer from a "disability" under the ADA arguing only that she was not actually disabled; 2) that she was not

---

[71]Covington deposition, A, pp. 266-271

[72]Covington deposition, A, pp. 272-273, 317

[73]Raybon deposition, F, pp. 71-73; Bass deposition, G, pp. 56, 75; Maurello deposition, E, pp. 27, 30; Ballard deposition, H, pp. 32-35; Frederic deposition, I, pp. 29-30, 87-89

[74]Covington deposition, A, pp. 326-327, 330-331; Frederic deposition, I, pp. 74-77 (he actually wanted her in Reserves in Communications); Raybon deposition, F, pp. 28-29, 34, 35, 36, 37, 85, 87-89

[75]Raybon deposition, F, p. 37

"qualified" for the position because she had "attendance" problems; 3) Ms. Covington did not request accommodations; 4) she was not discriminated against because she wasn't terminated or constructively discharged; 5) she was not harassed on account of her disability arguing only that she is not actually disabled, hence she could not be harassed on account thereof; 6) she has no IIED claim; 7) she was not retaliated against arguing only that there lacks a "causal link"; and 8) she has no claim for punitive damages.

**Defendant makes no arguments relating to plaintiff's claims of disability discrimination/harassment or reprisal under Louisiana law and, hence, those claims are not properly before this Court. Most importantly, it is noted that defendant does not offer any arguments relating to Ms. Covington having a record of an impairment or was "regarded" as disabled by the defendant.** Defendant's failure to seek summary judgment on both the "regarded as" and "record of an impairment" disjunctive definitions of "disability" under the ADA renders summary judgment unavailable.

## LAW AND ARGUMENT:

### 1. The Standard for Summary Judgment

Summary Judgment is granted only where there is no dispute as to any genuine issue of material fact. **Credibility assessments are not permitted on summary judgment**. In evaluating a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party drawing all inferences in his favor. *Evans v. City of Bishop*, 238 F.3d 586, 589 (5th Cir. 2000). In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court clearly emphasized the paramount role that juries play, stressing that in evaluating summary judgment evidence, courts must refrain from the making of "credibility determinations, the weighing of the evidence, and drawing of legitimate inferences from the facts," which "are jury functions,

15

not those of a judge." *Fierros v. Texas Department of Health*, 274 F.3d 187, 190-191 (5th Cir. 2001).

## 2. "Disabled" within the meaning and intent of the ADA

The term "disability" under the ADA means "(A) a physical or mental impairment that substantially limits one or more of the major life activities; (B) a record of such impairment; **or** ( c) being regarded as having such an impairment." 42 U.S.C. §12102(2). In other words, an ADA plaintiff may show she is "disabled" under the ADA if she meets **any** of the three (3) criteria. The defendant, in this case, offers no argument that Ms. Covington was "regarded as" having an impairment or had a "record" of an impairment, because it cannot under the disputed facts present. According to 29 CFR §1630.2(j)(1), "substantially limits" means:

> (I) Unable to perform a major life activity that the average person in the general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

Factors in defining what substantially limits a major life activity include the following: "(I) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact from the impairment." 29 CFR §1630.2(j)(2). The term "major life activity" means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. *Kidwell v. Board of County Comm'rs*, (1998, DC Kan) 40 F.Supp 2d 1201 (emphasis added).

In determining the application of "regarded as" for the purposes of the ADA, the law covers the situation in which an individual **does not even have** an actual physical or mental impairment, rather, he/she has a disability "perceived" by the employer. In this case, Ms. Covington offers direct evidence that the defendant clearly "regarded" her as disabled. First, every one of her supervisors commented repeatedly to her, that she looked "crooked", she "walked funny", she was in obvious pain, she looked

16

funny because her pants were longer on one side than the other, that they knew her scoliosis was a life-long, incurable disability, that her spine/back was even "painful to look at", one of her hips was higher than the other, she was obviously "stooped" in her gait and stature. Second, all of her supervisors testified they knew she had "severe scoliosis" and that it was lifelong and incurable. Third, on her hire, defendant required her to fill out a form waiving entitlement to disability pension for her disability with "severe scoliosis" in 1997 (attached to Dartez Affidavit filed with defendant's Motion). Fourth, every one of her supervisors testified they knew that Ms. Covington missed work because of her disability.

The seminal cases involving "regarded as" disabilities are *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), and *Murphy v. United Parcel Service*, 527 U.S. 516, 119 S.Ct. 2133, 144 L.Ed. 2d 484 (1999). In *Sutton*, the Supreme Court acknowledged;

> There are two apparent ways in which individuals may fall within this statutory definition [of 'regarded as']: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, **OR** (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual - it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting. These misperceptions often 'result from stereotypic assumptions not truly indicative of . . . individual ability.' See 42 U.S.C. §12101(7). See also *School Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 284, 94 L.Ed.2d 307, 107 S.Ct. 1123 (1987) ('By amending the definition of 'handicapped individual' to include not only those who are actually physically impaired, but also those who are regarded as impaired and who, as a result, are substantially limited in a major life activity, Congress acknowledged that society's accumulated myths and fears about disability and disease are **as handicapping** as are the physical limitations that flow from actual impairment');. . .

> *Sutton*, 119 S.Ct. at 2149-2150 (emphasis added)

It is clear the defendant "regarded" Ms. Covington as being disabled. There is simply no explanation offered by the defendant for the continual comments levied at Ms. Covington by her supervisors and co-workers that she looks "crooked", that she "walks funny", or that, according to their own sworn testimony, Ms. Covington's scoliosis was "severe" and "debilitating". It is precisely these stereotypical assumptions by the defendant which the definition of "disabled" as including "regarded as" was designed to combat

17

in the workplace.

The ability to walk, especially without "obvious pain" or in an obviously "crooked" or "funny" fashion, constitutes a major life activity. Under both *Sutton* and *Murray*, the fact that the defendant perceived Ms. Covington as being substantially limited in the major life activity of walking on account of her impairments is enough to demonstrate her being "regarded as" disabled and, thus, trigger protection under the ADA.

Under *Sutton* and *Murray*, Ms. Covington shows that the defendant additionally regarded her as disabled from the major life activity of "working". In order to make this showing, Ms. Covington, unlike the *Sutton* plaintiffs or the plaintiff in *Murray*, shows that the defendant regarded her as disabled from broad classes of jobs, i.e., the four (4) daytime telecommunicator positions, the EVI position, the secretarial position, the COT (trainer) position, the radio room position, and the liaison position. See: *Murray* 119 S.Ct. at 2138; 29 C.F.R. §1630(j)(3)(I) (1998); *Bridges v. City of Bossier*, 92 F.3d 329, 332 (5th Cir. 1996). Ms. Covington shows she was "regarded as" and, thus, "disabled" under the ADA.

In the alternative, Ms. Covington shows she had a record of an impairment and is thus, disabled under the ADA. Although defendant does not seek summary judgment on Ms. Covington's claim in this regard and is thus now precluded from so doing, Ms. Covington offers the following recitation. It is clear she had a record of an impairment with this defendant dating back to 1997 and for which, until the end of 2003, she had been accommodated with straight-day, 8-hour shifts. In argument, defendant not only fails to even address the "record of impairment" component of "disabled", but offers no contravailing evidence that Ms. Covington had a record of an impairment with this defendant and that the defendant had, for years, accommodated her disability.[76] The only "change" that occurred in Ms. Covington was the change

---

[76]Indeed, attached to the Dartez Affidavit offered by defendant is the defendant's requirement of the plaintiff in 1997 that she waive any entitlement to disability Pension on account of her disability with "severe scoliosis"

18

in Commander of Communications - from Angelloz, who left, in part, because she was trying to keep accommodating Ms. Covington, to Frederic and Raybon. Ms. Covington's condition certainly did not improve and, indeed, deteriorated during her employment with the defendant. Notably, the defendant offers no reason - let alone any legitimate, non-discriminatory one - for all of the sudden refusing to accommodate Ms. Covington in the workplace where, for several years, it had. Ms. Covington was "disabled" as she had a "record" of an impairment with this defendant.

In addition, Ms. Covington shows she had an actual impairment with scoliosis and the ensuing degeneration in all of spinal column, including herniated disks in her cervical region and degenerative disks in her lumbar and sacral region. Ms. Covington also developed severe migraines which, according to her long-time treating physician, Dr. Wissner, were caused by her scoliosis and neck pain (the herniated disks were caused by the scoliosis, according to Dr. Isaza). Ms. Covington was "substantially limited" in the major life activities of walking, standing, bending, sleeping, and working. Put simply, Ms. Covington did not walk like the average person. According to all of the defendant's witnesses, Dr. Isaza, and Ms. Covington, she walked "crooked" and was "stooped"/bent over sideways. Dr. Isaza testified that Ms. Covington yielded a positive Patrick's test, meaning that she had an abnormal stance and an abnormal gait compared to the average person. Dr. Isaza also testified that Ms. Covington could not stand like the average person and suffered limitations in that regard. The defendant's own witnesses, along with Ms. Covington, testified that she was in "pain", and that the mere act of walking and standing caused her pain. Ms. Covington's husband testified that her disability was so severe that upon waking up in the morning, she was not able to move because her back is "so stiff", that she had constant problems with numbness in her legs where she would wake up, go to stand up and couldn't stand up. He attested this lasted "sometimes several days".[77] All she could do is lay in bed, unable to stand for 12 - 24 hours at a time,

_____

[77]James Covington deposition, J, pp. 35-36

which would happen weekly.[78]

Ms. Covington's disability is lifelong, can never be cured, and will continue to progress. Dr. Isaza testified that surgery is not even an option for Ms. Covington. While defendant argues in brief that Ms. Covington can use medication to "control her pain", such an argument is truly circular. As Ms. Covington testified, the medication does not alleviate her pain and concomitantly causes her to be drowsy, unable to concentrate, unable to function (remaining in bed), and unable to safely even operate a vehicle - let alone answer life and death calls in Communications. The medication also does not help her to stand or correct the near $45°$ acute angle in her spine. In short, the medication, such as it is, does not and cannot "correct" Ms. Covington's disability.

Assessing the "substantially limits" prong of the analysis yields to the determination of her "disabled" status. In *Waldrip v. General Electric Co.*, 525 F.3d 652, 655 (5th Cir. 2003), the Fifth Circuit described the substantial limitation requirement as the "linchpin" of determination for disabled status. "Substantially" means "considerable" or "to a large degree". See also: *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S.C. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d 615 (2000). In this case, the evidence clearly shows that Ms. Covington's ability to walk, stand, bend, sleep, and work are "substantially limited." Although this analysis remains on a "case by case" basis, it is clear from the evidence presented that Ms. Covington was "disabled" within the meaning and intent of the law.

Finally, defendant's argument that Ms. Covington was not a "qualified" individual falls flat. It is plain from the testimony of all of the defendant's witnesses that Ms. Covington was imminently qualified (and more qualified than the non-disabled individuals afforded the straight day, 8-hour positions) for the Communications positions. It is axiomatic for the defendant to argue that Ms. Covington was not "reliable" in her attendance, yet, one of the precise reasons therefor is the defendant's own refusal to afford

---

[78]James Covington deposition, J, p. 38

20

Ms. Covington accommodation in lessening her working hours to straight days, 8-hours/day, when it had done so repeatedly prior to 2004 and the change in administration. It also bears reminder that Lt. Bass, along with Ms. Covington, clearly cast doubt on the validity of the 23 days of absence over more than a year. Similarly, Ballard testified that she missed at least 20 working days in that same year and suffered no employment consequences when she was performing the training (CTO) and telecommunicator positions. Major Raybon, in his deposition, testified unequivocally that all of Ms. Covington's absences were deemed "explainable/excusable" and could never serve as any basis for an excessive absenteeism charge.[79] Ms. Covington was not only imminently "qualified" for the positions, she also trained most of the employees in Communications, and worked all facets of Communications in "fine" and exemplary fashion. Defendant's argument that Ms. Covington was not "qualified" has no basis under the disputed facts presented.

Genuine issues of material fact plainly exist on the question of whether Ms. Covington is "disabled" within the meaning and intent of and the ADA precluding the grant of summary judgment. In addition, as defendant does not contest on summary judgment that Ms. Covington was "regarded as" disabled or that she had a "record of an impairment". Summary judgment on the issue of whether or not Ms. Covington is "disabled" under the disjunctive definition contained in the ADA is plainly inappropriate.

**B. Discrimination**

At the outset it is noted that defendant offers no "legitimate, non-discriminatory" reasons for refusing to transfer Ms. Covington to the plethora of positions, including the four (4) straight day, 8-hour telecommunicator positions, as it is required under the law. Rather, the defendant focuses solely on the constructive discharge. The law requires that it provide a legitimate, non-discriminatory reason for all of the disputed employment actions - not just one.

---

[79]Raybon deposition, F, pp. 60-61, 56-57

21

The ADA provides that a "qualified individual" is someone who can perform the essential functions of his job **with or without reasonable accommodation**. 42 U.S.C. §12101 *et seq.* Essential functions of the job are "those functions that the individual must be able to perform unaided or with the assistance of a reasonable accommodation." 29 CFR § 1630.2(n). Adjustment of working hours is a "reasonable accommodation."

The Court in *Stradley v. Lafourche Communications, Inc.*, 869 F. Supp. 442 (E.D. La 1994) held that the employer's motion for summary judgment was precluded when material issues of fact existed as to whether the plaintiff was a qualified individual under the ADA. The defendant in *Stradley* argued that as a matter of law plaintiff was not a "qualified individual" because no reasonable accommodation was available. In *Stradley*, the plaintiff suffered from a psychological impairment, adjustment disorder with mixed emotional features, and was unable to return to work for an indefinite period of time. There was the possibility of transferring him to a less stressful position; therefore, the court concluded that "he might have been able to return to work immediately and perform satisfactorily if transferred to the position of cable installer". *Id.* at 444. As in this case, genuine issues of fact exist as to whether reasonable accommodations were available that would have allowed the plaintiff to perform essential functions of the job.

Ms. Covington testified, and several of the defendant's own supervisors corroborated, that she made repeated requests for accommodation in the form of transferring to a straight day, 8-hour position - several of which were available in 2004. Similarly, the defendant's own witnesses testified that they received several letters from Ms. Covington's treating physicians requesting the accommodation that she be afforded a consistent schedule and less than 12 hours in the work day. Defendant has offered no reasons - let alone any "legitimate, non-discriminatory" ones - as to why Ms. Covington's repeated pleas to be accommodated and transferred to a straight day, 8-hour job were rejected. Ms. Covington testified

22

(which the defendant now disputes) that she repeatedly told her supervisors that she would even take a cut in pay (as she did prior to 2004). At a minimum, this disputed fact belies entitlement to summary judgment.

In brief, defendant now attempts to argue that Ms. Covington did not submit a "written" request for these available positions and also argues (via the "Affidavit" of Frederic), contrary to his and its own witnesses' sworn testimony regarding the wide-spread availability of straight-day, 8 hour positions available throughout 2004 (which all attested Ms. Covington was the most qualified for) that there were no positions available. Ms. Covington (and the defendant's own witnesses) not only identified the precise positions by name, but also identified the non-disabled individuals who received these positions and the fact that these non-disabled individuals were far less qualified than Ms. Covington (including Ballard who was not even POST certified although the COT job posting clearly indicated POST certification as a requirement for that position). Defendant has undertaken no effort under either *Reeves* or *McDonald Douglas* to identify, much less make the requisite showing, that it had legitimate, non-discriminatory reasons for denying Ms. Covington any of these positions or her requested accommodation.

In *Cutrera v. Board of Supervisors of LSU, et al.*, 429 F.3d 108 (5th Cir. 2005), our Fifth Circuit addressed, head on, the obligations of an employer in providing reasonable accommodations in employment. One of the seminal issues in *Cutrera* was that her employers had terminated her, rather than initiating any dialog regarding potential accommodations, much less engaging in any interactive process. Rejecting the defendant's contentions, similar to those asserted herein, that the employee must use the magic words of "I need an accommodation", the *Cutrera* Court firmly held:

> An employer may not stymie the interactive process of identifying a reasonable accommodation for an employee's disability by preemptively terminating the employee before an accommodation can be considered or recommended.
>
> *Cutrera*, at 113

Not unlike the defendants in *Cutrera*, defendant made the unilateral decisions to repeatedly deny to Ms.

23

Covington any reasonable accommodations in 2004 (although it had done so in the past).

In May, 2004, after Ms. Covington had successfully re-qualified with her weapon and retained her POST certification and after she had repeatedly requested accommodations, defendant unilaterally and in violation of its own policy, ordered her to undergo three (3) fitness for duty examinations, even requiring her to go back to Dr. Isaza and obtain a "full release" or be fired. Following, again, her repeated requests for accommodation, including the medical correspondence received by the defendant in late 2004, defendant endeavored to write up Ms. Covington for the entire past year. This "write up", according to defendant's own witness, was something that never should have been done and was not valid.

When an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA. *Taylor v. Phoenixville School Dist.*, 174 F.3d 142, 165 (3rd Cir. 1999). In *Loulseged v. Akzo Nobel, Inc*., 178 F.3d 731 (5th Cir. 1999), the plaintiff requested, and received, an accommodation already and the employer was generally aware of the problems her medical restrictions posed in regard to the transport duties. **The court concluded that the plaintiff was not required to formally request a replacement accommodation.** The court additionally concluded that it is simply not up to the plaintiff to request the "right thing" or even a specific accommodation. Defendants have an extra duty to explore the employee's condition and the interactivity of the process may be of less importance. *Taylor,* 174 F.3d at 160. "When a breakdown occurs because an employer creates an objectively reasonable perception that the process is clearly at an end, the employer is as well placed as the employee to avoid the situation. It bears responsibility for salvaging the process." *Loulseged*, *supra,* at 739. In this case, the defendant bore and bears the responsibility for salvaging the process it clearly began when it refused her accommodations in February, 2004, and repeatedly thereafter, when it told Ms. Covington, on May 10, 2004 (without any justification), to go home, surrender her gear, and stripped her of two (2) days pay and state supplemental pay, wrote her up for "excessive absenteeism"

24

when, according to Major Raybon, she should never have been written up and where all of her absences were considered "excusable/explainable absences" and cannot serve as the basis for a write up, forced her to bring into the workplace her X-Rays and her MRI's to "prove" the severity of her scoliosis, refused to work with her regarding defensive tactics training, where Raybon testified that also should never have happened[80], constantly threatened her with transfer to the prison as a punishment, sat back when she was constantly and openly ridiculed on account of her disability in the workplace, forced her constructive discharge, and refused to even allow her to remain as a volunteer, Reserve officer in Communications.

Again, the defendant offers no "legitimate, non-discriminatory reasons" for any of this behavior and, under *Reeves* and *McDonald Douglas*, its utter failure to so do renders summary judgment inappropriate.

### 3. Constructive Discharge

At the outset it is noted that defendant does not cite to the current state of the law regarding constructive discharge relying, instead, on outdated jurisprudence. In *Pennsylvania State Police v. Suders*, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004), the Supreme Court lowered the bar for determining the existence of constructive discharge. The *Suders* Court commanded:

> Beyond that, we hold, to establish 'constructive discharge,' the plaintiff must make a further showing: She must show that the abusive working environment became so intolerable **that her resignation qualified as a fitting response**. . . This affirmative defense [2-part affirmative defense to either liability or damages] will not be available to the employer, however, if the plaintiff quits in reasonable status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions. . . This Court granted certiorari, . . . to resolve the disagreement among the Circuits on the question whether a constructive discharge brought about by supervisor harassment ranks as a tangible employment action and therefore precludes assertion of the affirmative defense articulated in *Ellerth* and *Faragher*. . . We conclude that an employer does not have recourse to the *Ellerth/Faragher* affirmative defense when a supervisor's official act precipitates the constructive discharge; absent such a 'tangible employment action', however, the defense is available to the employer whose supervisors are charged with harassment.
>
> *Suders,* 124 S.Ct. at 2349, 2350-51, (Emphasis added)

---

[80]Raybon deposition, F, pp. 79-81

Case 3:06-cv-00812-RET-SCR   Document 26   05/02/08   Page 25 of 33

In this case, Ms. Covington testified that she was, on a daily basis, until her constructive discharge on January 5, 2005, subjected to derogatory comments directed at her on account of her disability. The abusive working environment never abated and her resignation, in the face of the continuing onslaught of daily verbal abuse by her supervisors and co-workers, was clearly a "fitting response." Ms. Covington's own health had begun deteriorating as a result of the abusive working environment, including being diagnosed with and treated for depression. Recognized by the sole dissenter in *Suders*, Justice Thomas, the Supreme Court lowered the bar relating to constructive discharge:

> The Court has now adopted a definition of constructive discharge, however, that does not in the least resemble actual discharge. . . But, where the alleged constructive discharge results only from a hostile work environment, an employer is liable if negligent.
>
> *Suders,* 124 S.Ct. at 2358-9, Thomas, dissenting

It is clear Ms. Covington's "resignation" was a "fitting response" to the unabated situation and constituted constructive discharge.

### 5. Disability-based harassment

In brief, defendant seemingly advocates that this Court, on summary judgment, make a prohibited credibility determination. Specifically, defendant argues to this Court that "it should be noted that all of these alleged insults are completely unsubstantiated and the persons to whom they are attributed deny having made such claims." It is, indeed, an extraordinarily rare circumstance where harassers actually admit their conduct. This is why, in the ambit of employment litigation, the Supreme Court in *Reeves* severely cautioned courts that credibility assessments have no place on summary judgment.

As argued above, defendant does not contest Ms. Covington's assertion that she was "regarded as" and/or "had a record of an impairment" and is thus "disabled" under the ADA. Defendant's entitlement to summary judgment on plaintiff's claims of harassment based solely on its contention that Ms. Covington was not "actually disabled" must be rejected outright. In addition, Ms. Covington shows, as

argued hereinabove, she was also actually disabled. Her arguments are incorporated herein fully by specific reference.

Ms. Covington testified that the disability-based harassment was perpetrated on a "daily basis" by her supervisors (in her Chain of Command) and her co-workers. She also testified that she repeatedly objected to the harassment to her supervisors, to no avail. Similarly, she flatly disputes defendant's assertion in brief that she allegedly told Frederic she would take care of it herself. According to Ms. Covington, the harassment directed at her on account of her disability on a daily basis remained completely unabated until she left employment on January 5, 2005. Ms. Covington's testimony is in direct conflict with that of Frederic rendering summary judgment inappropriate.

Also noted, according to defendant's own witnesses, defendant had no policy regarding disability-based harassment/discrimination or retaliation. Ms. Covington continually alerted her "chain of command" that their behavior was offensive, unwelcome, yet no one did anything to stop the barrage from occurring on a daily basis.

The United States Fifth Circuit enunciated factors to be considered in order to establish a claim of illegal harassment. They are:

1) the plaintiff belonged to a protected class;
2) she was subjected to unwelcome [disability-based] harassment;
3) the harassment was based on [disability];
4) the harassment affected a 'term, condition or privilege of employment'; and,
5) the employer knew or should have known of the harassment and failed to take prompt remedial action.
   *DeAngelis v. El Paso Municipal Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir. 1995)

This inquiry is modified, where as here, the harassment is perpetrated by the plaintiff's supervisors. In the companion cases of *Faragher v. City of Boca Raton,* 118 S.Ct. 2275 (1998), and *Burlington Industries, Inc. v. Ellerth*, 118 S.Ct. 2257 (1998), the Supreme Court made it clear that where harassment is perpetrated by one's supervisors, the plaintiff is not required to show that the defendant "knew or should

27

have known" of the harassment and failed to take appropriate remedial actions. In other words, the fifth prong of the *DeAngelis* test is dispensed with where supervisors perpetuate the harassment. *Faragher* and *Ellerth* also make clear there is no affirmative defense where tangible employment action has been taken, as in this case, which includes the unfounded write up, the denial of Reserve status, the constructive discharge, the repeated denials of transfer, the denials of training because of her "medical problems" by Luker, and the repeated denials of promotional opportunities. The Supreme Court in the companion decisions of *Faragher* and *Ellerth* held:

> At the outset, we can identify a class of cases where, beyond question, more than the existence of the employment relation aids in commission of the harassment: when a supervisor takes a tangible employment action against the subordinate. . . When a supervisor makes a tangible employment decision, there is an assurance the injury could not have been inflicted absent the agency relation. A tangible employment action in most cases inflicts direct economic harm. . .
> *Ellerth*, at 2268, 2269.

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence.
> *Faragher,* at 2292-2293.

The disability-based harassment by Ms. Covington's supervisors never stopped until she left employment. The defendant had no policy and no mechanism, beyond the chain of command which consisted of these same supervisors, to address disability-based harassment. Not only is the two-part affirmative defense to either liability or damages completely unavailable to the defendant because it did nothing to remedy the situation and even had no policy (let alone affording any proof "by a preponderance"), but also the existence of tangible employment action precludes any such affirmative defense to either liability or damages.

In *Faragher*, the Court held:

> In order to accommodate the principle of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees, we adopt. . . . [A]n employer is subject to

Case 3:06-cv-00812-RET-SCR   Document 26   05/02/08   Page 28 of 33

vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. . . [N]o affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.
*Faragher*, at 2293.

The Court in the companion decision in *Ellerth*, further clarified:

. . . a tangible employment action would have taken the form of a denial of a raise or promotion. . . A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.
*Ellerth*, at 2268-2269.

The standard against which the conduct alleged by the plaintiff is judged is best stated by the United States Supreme Court in *Harris v. Forklift Systems,* 114 S.Ct. 367, 370-371 (1992):

Title VII [and the ADA] comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment. . . can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. . . the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their. . . gender. . . offends Title VII's broad rule of workplace equality.

In reiterating the holding in *Harris*, the Supreme Court in *National Passenger Railroad Corporation v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), held that evaluation of whether an environment is hostile or abusive is determined by looking to "all the circumstances, including the frequency of the discriminatory conduct, its severity; whether it unreasonably interferes with an employee's work performance."  *Morgan*; *Harris*.

Under the law, it is the "totality" of the circumstances - not any single event - that gives rise to liability for sexual harassment.  In this case, Ms. Covington testified that the unabated situation lead to depression, an inability to function, and was "killing her".  The harassment by the defendant was open, obvious, and pervasive.  It occurred out in the open Communications room every day Ms. Covington was at work and continued for an entire year.  Defendant is plainly not entitled to summary judgment on the plaintiff's claims of disability-based harassment.

29

## 6.  Intentional Infliction of Emotional Distress

A plaintiff seeking to recover for intentional infliction of emotional distress must establish: (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.  *White v. Monsanto*, 585 So.2d 1205 (La.1991).    The *White* Court held:

> The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interest. . . A plaintiff's status as an employee may entitle him to a greater degree of protection from insult and outrage by a supervisor with authority over him than if he were a stranger.
>
> *White*, at 1209-1210.

In  *White*, the Court acknowledged that this tort could occur in the workplace environment.  Indeed, we noted that "[r]ecognition of a cause of action for intentional infliction of emotional distress in a workplace environment has usually been limited to cases involving a pattern of deliberate, repeated harassment over a period of time."  *White,* at 1210.  Additionally, an employer's **continued inaction** also has been held to give rise to a claim for intentional infliction of emotional distress.  *Bustamento*, at 54; see also: *Brown v. Vaughn,* 589 So.2d 63 (La. 1991): combine all of the incidents together.  An employer's repeated failure to take appropriate remedial measures constitutes intentional infliction of emotional distress.  *Bustamento*, at 54, FN 15.   The actions and continued inaction of the defendant clearly constituted  outrageous behavior.  Ms. Covington became so ill as a result of this situation, she became depressed and began taking anti-depressants - the severity of her emotional distress is not challenged by defendant in its Motion.  Defendant is clearly not entitled to summary judgment on plaintiff's claims of intentional infliction of emotional distress.

## 7.  Retaliation

Defendant does not contest any claims of unlawful "reprisal" and, hence, said claims are not before

Case 3:06-cv-00812-RET-SCR   Document 26   05/02/08   Page 30 of 33

the Court.  Arguing only that plaintiff did not engage in "protected activity" and that there exists no "causal link", the defendant seeks summary judgment on plaintiff's claims of retaliation.  However, contrary to defendant's argument, Ms. Covington testified that every time she requested accommodation or was out of work because of her disability, she was directly told by her supervisors: "you are a pussy", you need to get out of bed and come to work, you are "milking some sort of backache", you are denied training because of your "medical problems/issues", you need to be on "medication" or "Prozac", you are a "liar", "fix your medical problems", you will be sent to the prison (a threat), "get yourself together and fix your medical issues in order to move forward, get rank, go to training classes", you need to "get over it", you are just "dragging out a backache", (Dupre): sick of it and he will "fix it", "buck up" and you are not going to be transferred to any daytime positions, "be careful".  These comments were made by all of Ms. Covington's supervisors and constitute direct evidence of retaliatory animus.  The comments were all made, especially those by Frederic, Bass, Luker, Dupre, in direct response to Ms. Covington's requests for accommodation.

A request for accommodation and, most assuredly, Ms. Covington's continual protests of the harassment in her working environment, constitute "protected activity" under the ADA.  In contrast to an ADA discrimination claim, a plaintiff bringing an ADA retaliation claim need not demonstrate that he/she has a disability.  By its own terms, the ADA retaliation provision protects any individual who has opposed any act or practice made unlawful by the ADA.  *Jones v.* UPS, 502 F.3d 1176, 1194 (10th Cir. 2007); *Krouse v. American Sterilizer*, 126 F.3d 494, 502 (3rd Cir. 1997); *Tabatchnik v. Continental Airlines*, 2008 U.S. App. LEXIS 2051 (5th Cir. 1/30/08) (unpublished opinion).

In this case, not only does Ms. Covington offer direct evidence of retaliatory animus, she also shows that the "write up", according to Major Raybon, was completely inappropriate, not warranted, and, according to defendant's own witnesses, all of Ms. Covington's absences were "explainable/excusable"

31

and could form the basis for any write up or even counseling directed at Ms. Covington. Similarly, under *Reeves*, Ms. Covington shows that defendant's now, purported reason for the write up, the retaliatory harassment, and refusals of accommodation were false. Hence, the trier of fact can freely infer that retaliation was "a" likely motivation.

### 8. Punitive damages

Defendant argues that Ms. Covington cannot establish that her rights were violated and, assuming she can, she is not otherwise entitled to punitive damages because the defendant acted with the "distinct belief that its discrimination is lawful." As set forth herein, Ms. Covington amply establishes that her rights have been violated. The defendant also fails to set forth any "undisputed facts" supporting its bald assertion that it acted with the "distinct belief that its discrimination is lawful." The proper standard against which claims for punitive damages is judged is one of whether or not the conduct at issue was undertaken with "malice or with reckless indifference" to the plaintiff's rights." *Kolstad v. American Dental Association*, 527 U.S. 526, 535, 119 S.Ct. 2118, 144 L.Ed. 2d 494 (1999). In *Dominic v. DeVilbiss Air Power Company*, 493 F.3d 968 (8th Cir. 2007), the Eighth Circuit had a recent occasion to opine on the standards applicable to claims for punitive damages. Relying on *Kolstad*, the *Dominic* Court elucidated that:

> Malice and reckless indifference can be shown by demonstrating that an employer discriminated '**in the face of a perceived risk that its actions will violate . . . law**.' **This standard refers to the employer's state of mind regarding its knowledge that it 'may be acting in violation of federal law, not its awareness that it is engaging in discrimination**.'
>
> *Dominic*, at 974 (emphasis added)

It is clear that the defendant acted in the face of a perceived risk that its actions may be in violation of federal law. In his deposition, Major Raybon testified that he had "discussions with HR" about Ms. Covington and her disability and that he and Frederic discussed Ms. Covington's scoliosis and accommodation. The evidence is clear that the defendant knew it may be acting in violation of the ADA,

Case 3:06-cv-00812-RET-SCR   Document 26   05/02/08   Page 32 of 33

yet chose to continue in its behavior. Similarly, in response to her protests and requests, the defendant, "numerous times" called her a "pussy", told her to "buck up", "get tough", "just do it", that she was a "liar", was "milking some kind of backache", and continued to threaten her. The "write up" was completely unjustified and unfounded according to defendant's own witnesses, yet the defendant did it anyway. Summary judgment is inappropriate regarding punitive damages.

## CONCLUSION:

Defendant's partial motion for summary judgment should be denied. Ms. Covington "disabled" under the ADA, without explanation beginning in 2004 denied reasonable accommodations that had been afforded to her in the past, ridiculed and harassed on account of her disability, retaliated against, and forced from her job. The defendant offers no "legitimate, non-discriminatory/retaliatory" reason for its conduct on every occasion. The defendant's failure to offer "undisputed facts" and its apparent reliance on "credibility" render summary judgment plainly inappropriate.

Respectfully submitted,

By:    s/Jill L. Craft
Jill L. Craft, T.A., #20922
721 North Street
Baton Rouge, Louisiana 70802
(225) 663-2612
Fax: (225) 663-2613
E-mail: jcraft@bitworx.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 1st day of May, 2008, I have served a copy of the above and foregoing  Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Andree Matherne Cullens and Harry Joseph Philips, Jr. by operation of the Court's electronic filing system.

Baton Rouge, Louisiana, this 1st day of May, 2008.

s/Jill L. Craft
Jill L. Craft

33